Filed 8/9/21  P. v. Brown CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>MICHAEL SEAN BROWN,<br><br>        Defendant and Appellant. | A156267<br><br><br>(Alameda County<br>Super. Ct. No. 18-CR-014514) |

Defendant appeals from a judgment after a jury trial finding him guilty of one count of forcible oral copulation.  (Pen. Code, former § 288a, amended and renumbered as § 287 by Stats. 2018, ch. 423, § 49, pp. 3215–3218.)[1]  He contends his trial counsel was ineffective for failing to challenge an allegedly biased juror; the prosecutor engaged in misconduct during closing argument; and the trial court made evidentiary and instructional errors.  We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

On September 20, 2018, the Alameda County District Attorney filed an information charging defendant with one count of forcible oral copulation (former § 288a, subd. (c)(2)(A)) and alleging seven prior felony convictions for which he received prison terms.  On December 5, 2018, the jury found defendant guilty of the charge and defendant stipulated to the truth of the

_____

[1] All further undesignated statutory references are to the Penal Code.

1

prior convictions. Defendant was sentenced to the aggravated term of eight years.

## I.     *Prosecution Case*

Jane Doe, who was 18 years old, worked as a sex worker.[2] On August 6, 2018, she placed an advertisement on an Internet Web site. Defendant responded to the advertisement, and following an exchange of text messages and phone calls, Doe and defendant arranged to meet in the parking lot of a Jack in the Box on International Boulevard in Oakland. Doe told defendant she was 23 years old.

Doe arrived at the Jack in the Box with two friends whom she had been with that evening. Based on her conversations and text messages with defendant, Doe believed she and defendant would have a "car date" and she would provide defendant a "suck and fuck," which Doe explained involves oral copulation and intercourse, with a condom. Doe testified that she never performed sex acts for customers without a condom, due to her fear of sexually transmitted diseases. Defendant was the last of several "dates" Doe had that evening. Earlier in the night, Doe provided oral copulation services to two other men.

Doe met defendant at approximately 3:20 a.m. on August 7, 2018. She got into defendant's car, and they drove to the parking lot of a commercial brick building in Oakland. After they were parked, Doe and defendant moved to the back seat of the car. Defendant asked Doe how much the hour would cost him, and she told him it was $200. Defendant asked if they previously agreed to $160. Doe told him no but said she would look through her phone for text messages confirming their agreement. She began scrolling

_____

[2] Throughout the opinion we shall refer to "sex worker" and "sex work" in lieu of "prostitute" and "prostitution."

through her text messages and did not find anything. She then thought they must have discussed the cost during a phone call. When Doe was about to propose that they split the cost difference, defendant began to hit Doe. Defendant struck Doe five or six times in the face, head, and arms with his open hand and fist. Defendant raised his voice and used a "rude" and "disrespectful" tone, calling her names like "punk" and "bitch." Doe was shocked and scared. She tried to reach for her stun gun inside her fanny pack, but defendant moved her fanny pack out of her reach in the front seat. She then tried to use her phone to make an emergency call to the police, but defendant took her phone before she could call them.

Fearing defendant would further hurt her, Doe decided to comply with his demands. Over the next three hours, defendant forced Doe to orally copulate his partially erect penis without a condom. During this time, defendant told Doe that if he ever saw her on International Boulevard again and she did not acknowledge him, he would hurt her. He also told her not to call him "baby" and, instead, to call him "daddy." He told her that if she called him "baby" he would "beat her ass." When she accidentally called him "baby," he hit her again.

Defendant told Doe how he wanted her to use her tongue on his penis. Doe told defendant her mouth was too dry to continue. Defendant told Doe to "suck the spit off his tongue and spit on his dick while he is jacking himself off." This cycle, of Doe orally copulating, her mouth getting dry, and Doe sucking the spittle from defendant's tongue while he masturbated himself, went on "numerous times."

Defendant smoked methamphetamine during the assault. Each time he took a "hit" from the pipe, he wanted Doe to "call him daddy and suck his dick."

3

Doe believed defendant was trying to be her pimp because he told her that he knew she was with two female friends and that he wanted to "watch over" them while they "walk the blade." Doe testified "the blade" referred to International Boulevard.

At one point, approximately an hour and a half into the assault, Doe told defendant she needed to use the bathroom. This was an excuse to see if defendant would let her out of the car. Defendant told Doe to urinate in a cup he had in his car, which she did.

Defendant told Doe to remove her top; she did so, and defendant sucked on her nipples. Defendant did not touch her vagina, but he did touch her buttocks. Doe estimated that she orally copulated defendant more than five times. At no point did she consent to these acts. She estimated that defendant threatened to hurt her four or five times during the assault.

Defendant never ejaculated. About 6:00 a.m., defendant told Doe he needed to go to work and that they were "done." As they drove back to the Jack in the Box parking lot, defendant told Doe to continue orally copulating him, and she did so. She was scared defendant might not take her back to the Jack in the Box, so she kept assuring him that she would not "tell anybody" and that she "was his and that, you know, he's my protector and all that stuff . . . just to make sure that I'm going to get right back to where he dropped me off." When they got back to the Jack in the Box parking lot, defendant gave Doe her belongings, and she got out of the car and memorized defendant's license plate number. She also tried to leave many fingerprints in defendant's car so that the police would know she had been there. Defendant never paid Doe.

Doe's friends T.W. and F.B. were waiting at the Jack in the Box in Doe's car. She told them what happened. Testifying as fresh complaint

4

witnesses, T.W. described Doe as "crying" and "upset" and having said she had been raped and hit. F.B. testified that Doe was crying and appeared "devastated" and "shocked" when she returned to the car and that Doe kept repeating that she had been raped.

Doe initially drove to her uncle's house in Oakland for "[v]iolent help . . . ." But then she changed her mind about involving her uncle and turned her car around.[3] She called 911 after her phone recharged, which was about 10 to 15 minutes after defendant dropped her off. She met the police back at the Jack in the Box parking lot, and she was taken to the hospital.

The recording of Doe's 911 call was played back for the jury. Doe told police she had been "raped orally" and kidnapped for three hours by a Black man in his 40's. She reported that she had been "hit, punched, [and] slapped" in the back of the man's car; the man was "smoking crystal"; and he told her that if he saw her "out here again he's going to beat my ass."

Officer Elliot Diaz met Doe at the Jack in the Box. He testified she appeared upset. He transported her to the hospital and took a statement from her at the hospital.

---

[3] There was conflicting testimony as to whether Doe arrived at her uncle's house. At the preliminary hearing, she testified she drove to her uncle's house and knocked on the door but no one answered and then she drove back to the Jack in the Box and called 911. At trial, she initially testified she got to her uncle's house and then turned around, but on cross-examination she testified that she "didn't make it there." When defense counsel presented Doe with her preliminary hearing testimony, she stated she did not remember whether she got to her uncle's house but remembered turning around and calling the police. F.B. testified that Doe pulled into her uncle's driveway, got out of the car, and had a 10- to 15-minute conversation with someone through the screen door before returning to the car. T.W. testified that Doe started driving to her uncle's house but did not make it there and then went back to the Jack in the Box.

5

Doe underwent a sexual assault forensic examination. She testified that she had pain and soreness on the roof of her mouth and throat after being with defendant. Physician Assistant Hung-Wen Sun, designated as an expert in sexual assault exams, examined Doe. The exam showed signs of petechiae, or popped blood vessels, on the roof of Doe's mouth. Sun testified that petechiae were consistent with forced oral copulation but acknowledged they could also be caused by consensual oral copulation, excessive vomiting, or coughing. DNA swabs taken from Doe's left breast contained a single sperm. Defendant could not be eliminated as the sperm's donor.

Defendant texted Doe multiple times after dropping her off at the Jack in the Box. About 6:41 a.m., while Doe was driving to her uncle's house, she received a text from defendant asking, " 'Are you good?' " Doe responded, " 'Yes, I'm fine.' " Defendant replied, " 'Good,' " and then wrote, " 'Who am I?' " Doe recognized the phrase as one defendant used during the assault, when he told her to call him "daddy." She did not respond to his text, and then he wrote, " 'Yeah, you upset bitch.' " At 7:09 a.m., defendant wrote, " 'Really should think about this. I don't want anything from you just to make sure you're safe at all times.' " He also texted her about the "track," which Doe understood to refer to International Boulevard, and about "P's," which she understood to mean "pimps." Doe continued not to respond to defendant's text messages. At 3:57 p.m., defendant sent Doe a final text stating: " 'Hi sexy I know I can't take back what happened last night. I feel like you did everything you could to satisfy me just to keep yourself safe. I just want to apologize to you. You're a sweet, young, beautiful woman and that shouldn't have happened. But just to let you know in this game right there, it's going to happen. And you did everything right I feel, but just know that that can happen with any race. You don't have to call me to let me know

6

anything, but I would like for you to text me and keep it 100 about how you feel. Whatever it is you want to do, that's up to you. I kind of feel like I should let you do to me what I did to you, slap me up, talk bad to me, make me go down on you, all of that. Whatever your response is, I respect it.' "

## II.   *Defense Case*

Defendant testified that Doe consented to their sex acts. He said they negotiated a price for oral copulation without a condom. Doe initially wanted $150 or $160 but then agreed to accept $120, for half an hour. Role-play, including name calling and "playful spanking," was also part of their agreement. Defendant asked Doe to call him "daddy" while she orally copulated him, and Doe did not express any reluctance to do so. Defendant gave Doe $120, which she put in her fanny pack.

They moved to the back seat and engaged in the agreed-upon role-play, during which defendant spanked Doe. Defendant denied slapping Doe or punching her. He believed they were in the parking lot for 90 minutes. He explained that they negotiated an additional hour for another $100. Defendant only had $60 in cash, and he told Doe he would go to an ATM for the rest of the money.

Defendant testified that because "it was taking a little while" for him to ejaculate, he told Doe he wanted to use his own hand while he kissed her and sucked on her breast. He spanked Doe a lot—four or five slaps at a time—to be "playful." Defendant never "physically hit [Doe]." When defendant was about to ejaculate, he had Doe put her mouth on his penis and he ejaculated into her mouth.

Defendant drove Doe back to the Jack in the Box parking lot, but he refused to stop at an ATM for the additional money. He told Doe he was not paying her because he had to "get myself off." Doe was upset and told

7

defendant that was "fucked up." Defendant testified that the only reason Doe accused him of sexual assault is because he did not pay her the additional $100.

Defendant admitted that he texted Doe multiple times and that he apologized in one of the texts. He said the apology was "for reneging on the hundred dollars."

On cross-examination, defendant admitted that during his police interview he lied when he told the police that Doe was upset because he ejaculated in her mouth. He acknowledged that sex workers who work for themselves may be harassed by pimps. He also acknowledged that pimps like to be referred to as "daddy." Defendant admitted threatening to send pimps after Doe but said he did not actually know any pimps. He also admitted using methamphetamine during his encounter with Doe.

## III. *Rebuttal*

Officer Martin Ziebarth testified as an expert in human trafficking, pimping, pandering, and sex work. He testified about the meaning of certain terms commonly used in sex work, and he explained that the role of the pimp is to provide protection for the sex worker from other pimps, from law enforcement and from sexual assault. He also explained how sex acts are negotiated, and he said acts without condoms are more expensive and many sex workers will not engage in any sex acts without condoms.

## DISCUSSION

## I. *Trial counsel was not ineffective for failing to challenge juror No. A11.*

Defendant asserts that juror No. A11's answers to the questionnaire and responses to the court's and counsel's follow-up questions established actual bias and that his trial counsel was ineffective for failing to ask

8

additional follow-up questions or to strike the juror from the panel.  We disagree.

## A.    Background

Prospective jurors filled out a 20-page questionnaire.  One of the questions was whether there was anything about the nature of the charge alone that would affect the potential juror's ability to be fair and impartial.  Juror No. A11, a 41-year-old woman, checked the "Yes" box and wrote, "Not sure, when I was younger in college, I did experience borderline sexual assault.  Never reported it, but today's sensitivities make me rethink personal past experiences."  She also responded "Yes" when asked if "[she had] any strong feelings about how the criminal justice system should handle cases of human trafficking, commercial sexual exploitation, sexual assault, and/or prostitution," explaining, "I have strong empathy for victims."

In the same questionnaire, juror No. A11 answered affirmatively when asked whether she could set aside her personal beliefs or values and follow the law as instructed by the court.  She also answered affirmatively when asked if she could follow the rule requiring that her decision in the case be based solely upon the evidence received during the trial and the court's instructions of the law.  Juror No. A11 agreed that a defendant in a criminal trial is presumed innocent and that a defendant has a right not to testify.

In response to a written question asking whether she could follow the rule that the testimony of one witness is sufficient for proof of a fact if she believed that witness, juror No. A11 checked the "No" box and wrote, "I don't know.  My training has been to validate sources, often with more than one source."

During voir dire, juror No. A11 orally responded regarding her educational and work background and stated, "In full transparency, I don't

know if I can be an impartial juror in this case given the nature of the case. I just empathize with victims." The court responded that the juror would be asked additional questions about some of the things she brought up in the questionnaire. The prosecutor later explained that jurors would be required to "set aside any bias, or sympathy, or issues that don't have to do with what factually happened on a given day" and then asked, "Does anyone feel they have anything they can't set aside in determining the facts in this case?" Juror No. A11 raised her hand, and the prosecutor commented that juror No. A11 had mentioned the #MeToo movement. Juror No. A11 responded, "Yes." The prosecutor stated that many people support the #MeToo movement and, "[E]ven with that political background, we need to make sure we find jurors who can support that cause personally, but in their role as jurors look at the facts, listen to the testimony, and look at the evidence as difficult as it may be . . . . Do you feel that you can do that?" Juror No. A11 responded, "I don't know," to which the prosecutor then said, "Tell me a little bit more about that. We do have to press you a little bit. I can try is a difficult answer."[4]

Juror No. A11 elaborated, "I definitely think there are a lot of women who felt powerless, you know. And society and the judicial systems kind of worked against them in the past. So I don't know if I can put aside this bias and be impartial. There might be somebody better suited to fill the seat. That's just my belief." The prosecutor then said, "With respect to what [*sic*] is better suited to fill the seat, we want to find people who—from all walks of life, who have different experiences and life experiences who can still look at

_____

[4] Based on the discrepancy between the transcribed answer, "I don't know," and the prosecutor's follow-up statement, "I can try is a difficult answer," it appears possible there was a transcription error. But whether the juror stated *I don't know* or *I can try*, there was further follow-up questioning regarding her beliefs.

10

these witnesses, right, and assess their credibility using their common sense. Sometimes that means using your life experience. What it doesn't mean is letting those sympathies overtake your ability to be fair. She's a woman, she's sitting there, she's talking about something hard, automatically I'm going to say he's guilty even if you don't believe her that wouldn't be fair."

At this point, the court interjected, "This issue comes up a lot of times in these types of cases. None of you have heard any of the testimony in this case. None of you know anything about the witnesses. Like the other prospective jurors said, these are people who [sic] you don't know. What you're going to basically be doing is listening to those witnesses and then assessing their credibility. And I guess when I hear people raise the issue that you raise, my question for you is if you heard a witness testify, a woman testify[,] and you felt that her testimony did not make sense, did not seem believable, had a lot of holes in it, caused you a lot of doubt that was reasonable, are you saying that just because she's a woman and just because you have these feelings about a number of political issues, #MeToo movement, et cetera, that you would vote for the prosecution just because that person is a woman?" Juror No. A11 responded, "No. I would use common sense."

The court responded, "Absolutely. That's basically what we want to have, jurors— [¶] Everyone comes here. We all come here with our beliefs and our issues and our experiences. But what we have to make sure is that those issues, experiences are not such that it would make you set aside your common sense and experience and make a decision based on just that issue. So you haven't heard any of the testimony. If the witness came in and the testimony did not make sense, was not reasonable, did not fit with anything that you heard during the course of trial, that witness would not have be [sic]

11

persuasive to you, right? So that's kind of what we want to get to is whether or not those issues that you have are so strong that you'd put aside your common sense and experience and make a decision based on something that was not reasonable and didn't make sense. Okay." The prosecutor then asked juror No. A11, "Do you feel comfortable doing that?" and she responded, "I can use common sense."

Defense counsel further asked juror No. A11 questions about her background, her husband's work as a chemist and her friends and relatives who work in the legal profession. Juror No. A11's friends and relatives in the legal profession included a cousin who worked as a district attorney and a friend who worked as a defense attorney. She stated that her relationships were "pretty balanced" and did not predispose her to either the prosecution or the defense side.

Juror No. A11 was not stricken for cause; nor did defense counsel exercise a peremptory challenge against her.

### B.     Analysis

To establish ineffective assistance of counsel, a defendant must show counsel's efforts fell below an objective standard of reasonableness and resulted in prejudice. (*People v. Mai* (2013) 57 Cal.4th 986, 1009.) In reviewing ineffective assistance claims, we defer to counsel's reasonable tactical decisions and presume counsel acted within the wide range of reasonable professional assistance. (*Ibid.*) "Because the use of peremptory challenges is inherently subjective and intuitive, an appellate record will rarely disclose reversible incompetence in this process." (*People v. Montiel* (1993) 5 Cal.4th 877, 911, overruled in part on other grounds in *People v. Sanchez* (2016) 63 Cal.4th 665, 686, fn. 13.) The California Supreme Court has "consistently rejected complaints about either the failure to excuse

prospective jurors on an individual peremptory basis, or the decision to accept the jury as constituted before exhausting such challenges." (*People v. Bemore* (2000) 22 Cal.4th 809, 836.)

Defendant argues juror No. A11 was actually biased against him based upon her statements that "she had been the victim of a 'borderline' sexual assault while in college" and that "she had 'strong empathy for victims.' " He asserts that given juror No. A11's bias, his trial counsel could not have had any sound tactical reason to leave her on the jury. On this record, we disagree.

First, we do not find juror No. A11's written responses that she suffered a "borderline sexual assault" in college and that she empathizes with victims of sexual assault sufficient, without more, to establish actual bias. " 'Actual bias' is 'the existence of a state of mind on the part of the juror in reference to the case, or to any of the parties, which will prevent the juror from acting with impartiality, and without prejudice to the substantial rights of any party.' " (*People v. Foster* (2010) 50 Cal.4th 1301, 1325, quoting Code Civ. Proc., § 225, subd. (b)(1)(C).) The juror's written responses do not establish an inability to act impartially. Notably, in the same questionnaire the juror confirmed that she could, in fact, set aside her personal beliefs or values and follow the law and that she could base her decision solely upon the evidence received and the court's instructions.

Second, we find that the follow-up questioning of juror No. A11 dispelled any possible bias against the defendant based on her stated empathy for victims, whether due to her own prior experiences or her personal beliefs. Her exchange with the court, in particular, confirmed that despite juror No. A11's personal experiences and beliefs regarding the

13

#MeToo movement and her empathy for victims, she was not predisposed to convict and, instead, she would use her common sense.

Further, juror No. A11's other responses to the written questionnaire indicated that she would be fair to the defendant, including her response regarding whether she could follow the single witness rule, in which she stated her training was "to validate sources, often with more than one source." Based upon juror No. A11's written responses and the follow-up questioning by the court and counsel, defense counsel could have made a reasonable tactical determination that juror No. A11 would be an impartial juror. Defendant has not demonstrated that his trial counsel was ineffective.

## II.    *Exclusion of evidence of Internet advertisement was not an abuse of discretion.*

Defendant contends the trial court abused its discretion and violated his constitutional rights to a fair trial and due process by excluding an Internet posting dated November 10, 2018, advertising Doe's telephone number. We review the trial court's ruling to exclude the Internet posting under the abuse of discretion standard and find no error. (*People v. Bautista* (2008) 163 Cal.App.4th 762, 782.)

### A.    Background

Prior to trial, the People learned of an online posting on "Cityxguide.com," dated November 10, 2018, by an individual representing herself as a 23-year-old female named "Jaylen" and inviting people to call the phone number listed. The phone number is associated with Doe. The post also included five photographs, none of which was of Doe. The People filed a motion to exclude any references to the posting and proffered that Doe denied making the post and denied engaging in sex work since the date of the offense. The People's motion further proffered that Doe recently had an argument with an acquaintance who then made several disparaging postings

14

on the Internet about Doe. The People moved to exclude the Cityxguide.com post on the grounds that it was irrelevant and hearsay, lacked foundation and authentication, and any possible probative value was substantially outweighed by the probability that its admission would necessitate an undue consumption of time to prove its authorship, confusing the issues and risking substantial prejudice.

Defense counsel filed a motion pursuant to Evidence Code sections 782 and 1103 arguing for admission of the posting. Specifically, the defendant argued the posting was relevant to Doe's credibility because "it is not reasonable to believe that within several months of being sexually assaulted while working as a prostitute [Doe] has returned to the same activity that led to her being sexually assaulted by defendant."

The trial court granted the prosecution's motion to exclude the post and denied the defendant's motion. The trial court found the post had not been authenticated and that it was not relevant whether Doe continued to work as a sex worker following the offense.

During Doe's trial testimony, she denied she continued to work as a sex worker after the assault. On cross-examination, she acknowledged that during her recorded police interview, after the police officer left the interview room, she told her friend[5] that she planned to continue working as a sex worker. She testified, however, that she never returned to sex work because she was afraid after the assault. Doe also admitted that after the assault she did not remove any Internet listings she previously posted. She acknowledged receiving responses to her listings after the assault, but she testified that she did not reply to them. She further testified that about two

_____

[5] Doe's friend accompanied her to the police interview for moral support.

15

weeks before the trial, she deleted the "Textnow" app and was no longer able to communicate with men who respond to listings.

## B. Analysis

Generally, a defendant may not question a witness who claims to be a victim of sexual assault about the victim's sexual activity. (Evid. Code, § 1103, subd. (c)(1).) Evidence Code section 782 provides an exception to this general rule. (*People v. Mestas* (2013) 217 Cal.App.4th 1509, 1514.) "Evidence Code section 782 requires a defendant seeking to introduce evidence of the witness's . . . sexual conduct to file a written motion accompanied by an affidavit containing an offer of proof concerning the relevance of the proffered evidence to attack the credibility of the victim. [Citations.] The trial court is vested with broad discretion to weigh a defendant's proffered evidence, prior to its submission to the jury, 'and to resolve the conflicting interests of the complaining witness and the defendant.' [Citation.] 'The trial court need not even hold a hearing unless it first determines that the defendant's sworn offer of proof is sufficient.' " (*Ibid.*)[6]

The exclusion of the Cityxguide.com posting was not an abuse of discretion. The posting was neither authenticated nor relevant to Doe's credibility. The trial court was not required to hold a hearing unless it first determined the sufficiency of defendant's sworn proffer. Here, the defendant's proffer referred to "what appeared to be an on-line prostitution

---

[6] Evidence Code section 782, subdivision (a) sets forth the procedural requirement for the defendant's motion to permit evidence of a witness's sexual conduct, which includes that the defendant must make an offer of proof. Evidence Code section 782, subdivision (a)(3) states: "If the court finds that the offer of proof is sufficient, the court shall order a hearing out of the presence of the jury . . . and at the hearing allow the questioning of the complaining witness regarding the offer of proof made by the defendant."

16

ad posted by [Doe]" but presented no evidence that Doe posted the ad. Nor did defendant's proffer specifically dispute the prosecutor's statement that the photos in the ad were not of Doe and the name used in the posting was not Doe's name. As the trial court noted, there were "[h]uge issues with regard to authenticating . . . ."

Nor did the trial court err in finding that the evidence was not sufficiently probative of Doe's credibility. Doe admitted she was working as a sex worker on the night of the assault. Whether she continued to do so after the assault was not probative of whether defendant sexually assaulted her. To allow the defendant to question Doe about the Cityxguide.com posting would likely involve undue time, confusion and prejudice in order to attempt to establish the origins of the post, outweighing any possible probative value, which was marginal at best. (Evid. Code, § 352.) The trial court's determination that the defendant's offer of proof was insufficient to warrant an Evidence Code section 782 hearing was not error. (*People v. Mestas, supra*, 217 Cal.App.4th at p. 1514.)

Moreover, we find that any possible error was harmless because it is not reasonably probable that a result more favorable to the defendant would have been reached in the absence of any assumed error. (See *People v. Cunningham* (2001) 25 Cal.4th 926, 999 ["[T]he exclusion of defense evidence on a minor or subsidiary point does not interfere with [a] constitutional right. [Citation.] Accordingly, such a ruling, if erroneous, is an 'error of law merely,' which is governed by the standard of review announced in *People v. Watson* (1956) 46 Cal.2d 818, 836"].) Doe was cross-examined as to whether she continued to engage in sex work following the assault; although she denied she did so, she admitted she did not delete her prior Internet postings after the assault and that she received responses to them. It is not reasonably

17

probable that the jury would have reached a different result if it had heard questioning regarding the Cityxguide.com post. (*Watson, supra*, 46 Cal.2d at p. 836.)

Defendant's constitutional arguments based on the Sixth and Fourteenth Amendments are also without merit. "Exclusion of the evidence of a victim's sexual history does not deny the defendant a fair trial. There is no fair trial problem with exclusion of all such evidence under Evidence Code section 1103. 'That limited exclusion no more deprives a defendant of a fair trial than do the rules of evidence barring hearsay, opinion evidence, and privileged communications.' [Citation.]" (*People v. Mestas, supra*, 217 Cal.App.4th at p. 1517.) Nor did the trial court's evidentiary ruling violate defendant's rights under the confrontation clause. "A trial court's limitation on cross-examination pertaining to the credibility of a witness does not violate the confrontation clause unless a reasonable jury might have received a significantly different impression of the witness's credibility had the excluded cross-examination been permitted. [Citations.]" (*People v. Quartermain* (1997) 16 Cal.4th 600, 623–624.) Here, Doe was cross-examined and impeached on the issue of whether she continued to work as a sex worker following the assault. We find that further questioning of Doe regarding the Cityxguide.com posting would not have given a reasonable jury a significantly different impression of Doe's credibility. (*Ibid.*)

III. ***Admission of expert testimony regarding human sex trafficking was not an abuse of discretion.***

Defendant contends the trial court erred when it admitted testimony of a human sex trafficking expert because the testimony was (1) irrelevant, cumulative, and inflammatory and (2) improper, prejudicial profile evidence. We find no error.

18

## A. Background

The People offered Officer Martin Ziebarth as a rebuttal witness to testify as an expert on pimping, pandering, human trafficking, and sex work. Officer Ziebarth's testimony was intended to define terms used by Doe and defendant and to contextualize the threats defendant made to Doe. He was also expected to testify about "traditional means of pimping" and monetary negotiation in sex work. The defendant objected that such testimony was improper profile evidence and that testimony regarding the meaning of terms used by Doe and defendant was unnecessary and irrelevant because of the fact that witnesses had already explained the terms. The trial court allowed the expert to testify, finding that he would assist the trier of fact by providing knowledge and information outside the knowledge and experience of common jurors.

Officer Ziebarth's testimony defined certain terms used at trial, including " 'P' " (short for pimp), " 'the blade' " (a street with a high concentration of sex work activity), " 'renegade' " (a sex worker working without a pimp), " 'the game' " (the life of sex work), and " 'daddy' " (used in place of *pimp*). He also testified about negotiating prices for various sex acts and that sex acts without condoms cost more. Over defense counsel's objections, Officer Ziebarth testified about different types of pimps. He explained that "Romeo" pimps recruit women as dating interests on social media, spending money on them and then making them engage in sex work to pay them back. "Guerilla" pimps find women on the street and use violence, coercion and "dehumanizing sexual assault" against them, stealing property from them and then "[putting them] back out on the track." Officer Ziebarth testified that sexual assault is common among sex workers and that it is also common for sex workers to continue working after they have been

19

sexually assaulted. Finally, he testified that sex workers are reluctant to contact law enforcement even when they are sexually assaulted.

## B. Analysis

We review the trial court's decision to admit expert testimony under the abuse of discretion standard. (*People v. Catlin* (2001) 26 Cal.4th 81, 131.) Evidence Code section 801, subdivision (a) permits an expert to testify about "any subject, 'sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.' " (*People v. Brown* (2004) 33 Cal.4th 892, 905, quoting Evid. Code, § 801, subd. (a).) Here, although the defendant was not charged with pimping, the sexual assault occurred during sex work, and both the victim and the defendant used various terms common among sex workers and those frequenting sex workers but beyond the common experience of typical jurors. Some of the terms were used by the defendant in his text messages to Doe following the assault. We find that the trial court acted within its discretion in finding that Officer Ziebarth's testimony would assist the jurors by providing knowledge and information outside their knowledge and common experience.

We also reject defendant's argument that Officer Ziebarth's testimony constituted improper profile evidence. Such evidence is " 'a listing of characteristics that in the opinion of law enforcement officers are typical of a person engaged in a specific illegal activity' " and relies on the syllogism that "criminals act in a certain way; the defendant acted that way; therefore, the defendant is a criminal." (*People v. Robbie* (2001) 92 Cal.App.4th 1075, 1084–1085 (*Robbie*).) Improper profile evidence unfairly allows the jury to make the impermissible inference "that, because the defendant manifested some characteristics, he committed a crime." (*Id.* at pp. 1086–1087.) However, as explained by the Supreme Court, " 'Profile evidence,' . . . is not a separate

20

ground for excluding evidence; such evidence is inadmissible only if it is either irrelevant, lacks a foundation, or is more prejudicial than probative." (*People v. Smith* (2005) 35 Cal.4th 334, 357, overruled on other grounds as stated in *People v. Beck and Cruz* (2019) 8 Cal.5th 548, 670.)  Further, "profile evidence is objectionable when it is insufficiently probative because the conduct or matter that fits the profile is as consistent with innocence as guilt."  (*Smith*, at p. 358.)

Defendant relies on *Robbie*, in which the court reversed a conviction where the prosecution expert in "behaviors and conduct of persons who commit sexual assaults" testified in the form of hypothetical questions that the various types of conduct described by the victim was common among sex offenders.  (*Robbie, supra*, 92 Cal.App.4th at pp. 1082–1083, 1084.)  In *Robbie*, after the prosecutor asked the expert a series of questions regarding common conduct of sex offenders, he posed a summary hypothetical including all of the conduct previously mentioned and asked the expert what conclusion she would reach about the described conduct.  The expert responded, " 'That it's the most prevalent type of behavior pattern that I have seen with sex offenders.  It's the most common type of behavior pattern.' "  (*Robbie, supra*, at p. 1083.)  The prosecutor then emphasized the expert's testimony in closing argument.  (*Id.* at p. 1088.)  The court found it was an abuse of discretion to admit the expert's testimony, which did not "help the jury objectively evaluate the prosecution's evidence, . . . but . . . guide[d] the jury to the conclusion that the defendant was guilty because he fit the profile."  (*Id.* at pp. 1084, 1087.)  It further found that "given the highly prejudicial nature of the expert's testimony and the prosecutor's argument, . . . there is a reasonable probability the jury would have reached a result more favorable to defendant had the court excluded [the expert's] testimony."  (*Id.* at p. 1088.)

We find *Robbie* distinguishable.  Here, Officer Ziebarth's testimony provided background information that may have assisted the jury in understanding the terminology used by Doe and defendant, typical negotiations between sex workers and their customers, and statements made in defendant's texts regarding pimps.  Unlike in *Robbie*, Officer Ziebarth was not presented with a summary hypothetical including all of the facts of the case and asking him to provide a conclusion about the conduct.  (*Robbie, supra*, 92 Cal.App.4th at p. 1083.)  Nor did the prosecutor emphasize Officer Ziebarth's testimony during closing argument.[7]  Simply put, it was never suggested to the jury that defendant should be convicted because he fit the profile of a sex offender.  Rather, the focus of the prosecutor's closing argument was Doe's testimony; the corroboration of two fresh complaint witnesses; and the defendant's own text messages to Doe in which he apologized and stated, " 'I know I can't take back what happened last night.  I feel like you did everything you could to satisfy me just to keep yourself safe. . . .  I kind of feel like I should let you do to me what I did to you, slap me up, talk bad to me, make me go down on you, all of that.' "  The prosecutor contrasted this evidence with defendant's changing story and admitted lies.

Moreover, even if we were to find that portions of Ziebarth's testimony regarding pimping amounted to improper profile evidence, under the facts of this case we would find the error harmless.  Here, as in many sex assault cases, witness credibility was a key factor, but Doe's testimony was largely corroborated by defendant's own text message sent to Doe several hours after she reported the incident to the police.  We find that even if Officer Ziebarth's

---

[7] During closing argument, the prosecutor made brief references to Officer Ziebarth's testimony regarding inconsistencies in evidence, the use of the term *prostitute*, and his experiences with the behavior of sexual assault victims.  She did not reference his testimony regarding pimps.

testimony had been excluded, it is not reasonably probable that the jury would have reached a different result. (See *People v. Prieto* (2003) 30 Cal.4th 226, 247 ["The erroneous admission of expert testimony only warrants reversal if 'it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of error' "].)

## IV. *CALCRIM No. 1190 instruction was not error.*

Defendant contends the trial court erred by instructing the jury with both CALCRIM No. 301 (single witness's testimony) and CALCRIM No. 1190 (other evidence not required to support testimony in sex offense case).[8] Specifically, he complains that CALCRIM No. 1190 was unnecessary and improperly emphasized Doe's testimony, signaled to the jury that Doe's testimony did not need to be scrutinized as closely as other evidence, and diluted the prosecution's burden of proof beyond a reasonable doubt.

Although defendant did not object to CALCRIM No. 1190, he contends the issue may be considered on appeal without any objection below because the challenged instruction affected his "substantial rights." (§ 1259; *People v. Taylor* (2010) 48 Cal.4th 574, 630, fn. 13.) We find that even assuming the issue was not forfeited, defendant's argument is without merit.

We review instructional error claims de novo and determine whether the trial court fully and fairly instructed the jury on the applicable law. (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.) In making this determination, we consider the instructions taken as a whole, and we assume jurors are intelligent people capable of understanding and correlating all the

---

[8] The jury was instructed, "The testimony of only one witness can prove any fact. Before you conclude that the testimony of one witness proves a fact, you should carefully review all the evidence" (CALCRIM No. 301), and, "Conviction of a sexual assault crime may be based on the testimony of a complaining witness alone." (CALCRIM No. 1190.)

23

court's jury instructions. (*People v. Campbell* (2020) 51 Cal.App.5th 463, 493.)

In *People v. Gammage* (1992) 2 Cal.4th 693, the Supreme Court rejected the same arguments defendant makes here. The court concluded that instructions substantially similar to CALCRIM Nos. 1190 and 301 did not "create a preferential credibility standard for the complaining witness, or somehow suggest that that witness [wa]s entitled to special deference."[9] (*Gammage*, at p. 701.) The court explained: "Although the two instructions overlap to some extent, each has a different focus. CALJIC No. 2.27 focuses on how the jury should evaluate a fact . . . proved solely by the testimony of a single witness. It is given with other instructions advising the jury how to engage in the *fact-finding* process. CALJIC No. 10.60, on the other hand, declares a substantive rule of law, that the testimony of the complaining witness need not be corroborated. It is given with other instructions on the legal elements of the charged crimes. [¶] Because of this difference in focus of the instructions, we disagree with defendant . . . that, in combination, the instructions create a preferential credibility standard for the complaining witness, or somehow suggest that that witness is entitled to special deference. The one instruction merely suggests careful review when a fact depends on the testimony of one witness. The other tells the jury there is no

---

[9] The instructions at issue in *Gammage* were CALJIC No. 2.27, which stated, " 'Testimony as to any particular fact which you believe given by one witness is sufficient for the proof of that fact. However, before finding any fact *required to be established by the prosecution* to be proved solely by the testimony of such a single witness, you should carefully review all the testimony upon which the proof of such fact depends,' " and CALJIC No. 10.60, which stated, " 'It is not essential to a conviction of a charge of rape that the testimony of the witness with whom sexual intercourse is alleged to have been committed be corroborated by other evidence.' " (*Gammage, supra*, 2 Cal.4th at pp. 696–697.)

24

legal corroboration requirement.  Neither eviscerates or modifies the other. . . .  'There was no singling out of the testimony of the prosecuting witness with the view of giving it undue prominence before the jury.' [Citation.]  Nor do the instructions 'dilute[] the "beyond a reasonable doubt" standard.'  [Citation.]  The instructions in combination are no less correct, and no less fair to both sides, than either is individually."  (*Id.* at pp. 700–701.)  *Gammage* concluded it was proper to give both instructions in sex offense cases.  (*Id.* at p. 702.)

Defendant attempts to distinguish *Gammage* by arguing there is a "critical difference in the phrasing" of CALJIC No. 10.60, at issue in *Gammage*, and CALCRIM No. 1190.  Specifically, defendant contends that because CALCRIM No. 1190 "says nothing about corroboration," the reasoning of *Gammage* does not apply.  We find no substantial difference between CALJIC No. 10.60's statement that a complaining witness's testimony need not "be corroborated by other evidence" and CALCRIM No. 1190's statement that a conviction in a sexual assault case "may be based on the testimony of a complaining witness alone."  They both convey the same legal principle, and the difference in wording does not make *Gammage* inapposite.

## V.  *There was no prosecutorial error.*

Defendant argues the prosecutor committed prejudicial misconduct during closing arguments by:  (1) vouching for Doe's veracity; (2) accusing defendant of lying and conveying her own belief in his guilt; (3) impugning defense counsel; (4) referencing her gender and personal experience of gender discrimination; and (5) urging jurors that they would be contributing to the larger societal problem if they acquitted defendant.

25

Defendant argues that his claim is cognizable on appeal because, although he did not make specific objections to every instance of error he now raises, the error was pervasive and his multiple objections at trial were sufficient to preserve the issue. In the alternative, defendant argues that to the extent his claim is forfeited, it is due to his trial counsel's ineffective assistance. Even assuming no forfeiture, we find no prosecutorial misconduct during closing argument, and therefore defendant's trial counsel was not ineffective for failing to object to the prosecutor's statements.

"A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." (*People v. Morales* (2001) 25 Cal.4th 34, 44.)

Under these standards, " ' " '[a] prosecutor may "vigorously argue his case and is not limited to 'Chesterfieldian politeness' " [citation], and he may "use appropriate epithets . . . ." ' ' " [Citation.]' [Citation.]" (*People v. Hill* (1998) 17 Cal.4th 800, 819.) When the alleged prosecutorial misconduct stems from the prosecutor's remarks or comments made before the jury, "the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*People v. Morales, supra*, 25 Cal.4th at p. 44.)

A.    **Vouching for Doe's Veracity**

The prosecutor began her closing argument by stating, "You got to see [Doe] for her flaws, but also you got to see her for her strength and for her honesty." Defendant argues that the prosecutor improperly vouched for Doe's

veracity by describing Doe as "honest" and a "strong girl" who gave a "credible account" of sexual assault and by stating, "I submit to you Jane Doe was actually and reasonably afraid that if she did not do this, the defendant would hurt her then and in the future."

A prosecutor improperly vouches for a witness when he or she expresses a personal belief in the witness's integrity based upon matters outside the trial record. (*People v. Sully* (1991) 53 Cal.3d 1195, 1235.) However, prosecutorial comments on the credibility of a witness are not improper when they are based on evidence before the jury. (*Ibid.*) Here, the arguments defendant complains of were based upon the testimony of Doe and the other evidence in the case. The prosecutor stated that "Doe was honest about what she couldn't remember" and then presented a summary of details that Doe was unable to remember, including the make and model of defendant's car, the exact time she began conversing with the defendant, and whether she got to her uncle's house. Similarly, the prosecutor's comment that Doe was a "strong" girl was made as part of the prosecutor's discussions of Doe's emotional state after the assault and while testifying and of Doe's testimony that "even when she is emotional, she may not cry." The prosecutor's statements regarding Doe's veracity during closing argument were a fair comment on the evidence and do not constitute improper vouching. (See *People v. Williams* (1997) 16 Cal.4th 153, 221 [" ' "It is settled that a prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom" ' "].)

Defendant further complains that the prosecutor improperly stated, "I think Jane Doe was forced to orally copy late [*sic*] the defendant[.]" The trial court sustained defendant's objection that the prosecutor's opinion was not

27

proper argument and struck the comment "[j]ust to the extent that she said 'I'." On appeal, defendant argues that the sustaining of defendant's objection and the partial striking of the prosecutor's comment were insufficient "to erase from [the jurors'] minds that the prosecutor . . . personally believed Doe's account." We disagree. The trial court properly struck the objectionable portion of the prosecutor's argument, and the prosecutor then immediately returned to arguing that "the evidence shows . . . Doe was forced to orally copulate the defendant . . . ."

Contrary to defendant's argument, the prosecutor did not engage in a pattern of improper vouching for Doe's credibility. The single instance in which the prosecutor arguably interjected her personal belief by stating "I think" was stricken, and the jury was instructed both that "[n]othing the attorneys say is evidence" and that "[the jury] alone must judge the credibility or believability of the witnesses." We find that none of the complained-of comments "infect[ed] the trial with such unfairness as to make the conviction a denial of due process." (*People v. Morales, supra*, 25 Cal.4th at p. 44.) Nor is there "a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*Ibid*.)

## B.    Accusing Defendant of Lying

Defendant argues the prosecutor also improperly "signaled to the jury her personal belief that Brown perjured himself and was guilty of the offense." Specifically, defendant complains that the prosecutor called him an "arrogant" and "defensive" "liar" who was motivated to commit perjury "because he wants to walk out those doors," and argued "he lies to police generally because he's a drug dealer and that's what he does" and that "he's fine with lying if it will save him."

"A prosecutor may vigorously challenge the validity of any defense, and can characterize the testimony of a witness, including the defendant, as untruthful . . . ." (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1337.) Here, defendant admitted during cross-examination that he lied during his police interview when he said that Doe was upset because he ejaculated in her mouth. He explained, "I don't give just freely information to officers. It's not in me. As you can see, I'm a drug dealer once upon a time in my life, so that's going to stick with me as far as dealing with police." He later testified, "I told . . . [the police officer] several different stories. And he is in my personal, private business, so I told him whatever came to my mind." Defendant also admitted he lied to Doe, stating, "We're talking about a prostitute. I lie to prostitutes every time I talk to them, so why should I be telling her the truth about anything? They lie to me, I lie to them." It was not improper for the prosecutor to highlight the defendant's admitted lies during closing argument and point out the inconsistencies in his testimony. (*People v. Williams, supra*, 16 Cal.4th at p. 221.)

### C. Impugning Defense Counsel

Defendant next contends that the prosecutor indirectly accused defense counsel of suborning perjury by using leading questions. Specifically, defendant complains of the prosecutor's argument, "The only time [defendant] wasn't vague was when his attorney was leading him with, you said foreplay. Did you mean role play? Was this illegal activity between two consenting adults? You wanted Officer Delmoral to believe this was consensual because it was consensual. These were all questions where the attorney was giving him the answer in the question." Defendant further complains that the prosecutor "continued this theme" during her rebuttal

29

argument when she asserted, "It's offensive to say [Doe's] not a good enough victim," and referenced "victim blaming."

Defendant's trial counsel objected to the prosecutor's reference to his use of leading questions during closing argument. He argued this was misconduct because it suggested that he attempted to elicit false or misleading testimony and it disparaged him. The trial court disagreed that the prosecutor disparaged defense counsel and commented, "I think the argument is that the defendant, in his testimony, was attempting to mislead." The trial court refused defense counsel's request for an immediate curative instruction but did later instruct the jury, "To the extent that there were any comments which could be terminated [*sic*] as impugning the personal integrity of either of the counsel during the course of their argument, you should disregard those comments."

We agree with the trial court that the prosecutor's reference to leading questions did not improperly impugn defense counsel. When read in context, the prosecutor's focus was on the lack of specificity provided by the defendant. The prosecutor asked the jury to compare Doe's detailed account to the defendant's "quite vague" testimony, and then the prosecutor argued that the only time defendant was not vague was when he was led by defense counsel's questions. We find this line of argument as well as the prosecutor's reference to "victim blaming" to be a fair comment on the evidence. (*People v. Williams, supra*, 16 Cal.4th at p. 221.)

## D.    Gender References

Defendant argues the prosecutor committed "egregious error" when she referenced the genders of the parties and counsel during closing argument. He takes issue with the prosecutor's comment that "people look at women more critically than they look at men" and the example she used asking the

30

jury to think about whether they noticed her clothing or Doe's clothing and if they gave the same consideration to what the male defense counsel wore. Defendant ignores the context of the prosecutor's statement, which was a comment on the instruction that a jury must rely on the evidence and not allow speculation, bias, or sympathy to influence its decision. (CALCRIM No. 200.) The prosecutor argued: "We all have bias. We all probably have bias against illegal activities, prostitution being some of them, dealing drugs being others of them. But you can't let that bias overtake you. We all have inherent and implicit biases. Think for a second about how many of you looked at me every day, looked at what I was wearing, whether or not it was appropriate for court, looked at Jane Doe when she testified, maybe noticed she was wearing the same clothes both days? How many of you did the same thing with Mr. Ortega? Probably not all of you. And that's not to say it's malice, it's not to say it's not fair. People look at women more critically than they look at men. How many of you looked at the defendant in the same way that you looked at Jane Doe? Maybe not all of you. That's bias. It doesn't mean that you're a bad person. It doesn't mean that you're unfair. What that means is that you have to set that aside, right? If you don't like me, Ms. Weissenbach, that's okay. You're not the only one. But you can't let that overtake your ability to fairly assess the facts. So please, if you recognize that you are having all of a sudden having [*sic*] a bias, acknowledge it and then go back to the facts, right? Redirect yourself to the facts. We're all human. Sometimes we need to recalibrate in that way."

Far from improperly appealing to the gender of counsel or the victim, the prosecutor's comments expressly urged the jury to follow the law and focus on the facts rather than any gender biases. In context, her example to the jury in which she referred to herself, defense counsel, and the parties was

31

designed to highlight how implicit biases may improperly impact decisionmaking; the prosecutor urged the jury to recognize possible bias and then "redirect yourself to the facts."

Defendant further complains that the prosecutor improperly interjected herself into the case when she commented that the defendant "doesn't like me personally." The prosecutor's comment in closing argument was based on an exchange during the cross-examination of defendant regarding text messages between him and Doe. The prosecutor asked the defendant if he was frustrated by her asking him questions. He responded, "You personally, yes." The prosecutor asked, "Do you not appreciate when women ask you questions?" to which defendant responded, "[N]o, I don't have a problem with women." The prosecutor asked, "Just me?" and defendant responded, "At this present time, yes." During closing argument, the prosecutor summarized the defendant's text message to Doe, apologizing and stating, " 'I kind of feel like I should let you do to me what I did to you, slap me up, talk bad to me, make me go down on you, all of that.' " The prosecutor argued, "Those are his words even though he didn't like it when I read them back to him on cross-examination because he doesn't like me personally."

Defense counsel objected that the prosecutor's comment was "inappropriate and misconduct," and the trial court overruled the objection because the comment was consistent with the defendant's testimony and reminded the jury to base its decisions on the evidence it heard. The prosecutor then continued, "Remember when the defendant said he didn't like me? Not because I'm a woman. Of course not that. Not because he didn't like women questioning him. Of course not that. Just me personally." Although the defendant did not say *I don't like you* to the prosecutor, he did

acknowledge in the above quoted exchange that he was frustrated with her "personally" for her questioning and that he had a problem with her.

We find the prosecutor's statements during closing argument were fair comments on the defendant's testimony, during which he conceded his frustration with the prosecutor. (*People v. Williams, supra*, 16 Cal.4th at p. 221.)

### E. Urging Jurors that They Would Be Contributing to the Larger Social Problem if They Acquitted Defendant

Defendant's final argument regarding prosecutorial error repeats some of his earlier claims and asserts the prosecutor sent a "pervasive messag[e] throughout trial that to disbelieve Doe's testimony, jurors would be contributing to the 'victim-blaming' culture that prevent[s] sexual assault victims from coming forward." Defendant contends the prosecutor's argument improperly appealed to the passion and prejudice of the jury. Again, we find that the defendant's argument takes the prosecutor's comments out of context and that there was no error.

The defendant complains that the prosecutor told the jury "to look at the big picture, to not lose the forest for the trees," and that this somehow sent a clear message that to disbelieve Doe and acquit the defendant would contribute to the larger societal problem of sexual harassment and assault. Simply reading the rest of the prosecutor's sentence refutes the defendant's claim. The prosecutor's full statement was: "What I ask you to do is to look at the big picture, to not lose the forest for the trees, to look at the totality of the evidence and the totality of the circumstances that have been provided to you because that's precisely your role as a juror." She concluded her argument shortly after this statement by saying, "If you find yourself at any point in time down a rabbit hole, take a step back, look at the law, look at the elements of the crime that need to be satisfied. As long as you do that and

33

deliberate fairly with each other, I have faith you will find the only just verdict in this case and that is one of guilty." Contrary to defendant's claim, nothing in this line of argument suggests or implies that the jury must convict to correct a larger societal problem.

Defendant also points to the prosecutor's comments that some sexual assault victims do not immediately report their assaults due to fear they will not be believed or that they will be blamed; that sexual assaults can occur without visible injuries; that it was "the definition of victim blaming" for the defense to suggest that Doe was motivated to make a false report because she was angry the defendant did not pay her; and that challenges to Doe's credibility were "offensive."[10] We find no error. These statements made during closing argument properly referenced the evidence (e.g., that Doe immediately reported the incident, in contrast to some other sexual assault victims, and that sex workers may be victims of sexual assault) and responded to the defendant's closing argument. (See *People v. Bryden* (1998) 63 Cal.App.4th 159, 184 ["Rebuttal argument must permit the prosecutor to fairly respond to arguments by defense counsel"].)

We find that there is no "reasonable likelihood that the jury construed or applied any of the complained-of remarks [individually or collectively] in an objectionable fashion." (*People v. Morales, supra*, 25 Cal.4th at p. 44.)

### DISPOSITION

The judgment is affirmed.

---

[10] The prosecutor's use of the term "offensive" during closing argument was made in reference to the idea that sex workers cannot be victims of sexual assault and in response to the defendant's argument that Doe sounded more angry than upset on the 911 call.

34

_____
Jackson, J.


WE CONCUR:


_____
Fujisaki, Acting P. J.


_____
Petrou, J.


A156267/*People v. Michael Sean Brown*


35